UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: APPLICATION FOR WARRANTS TO SEARCH PREMISES AND VEHCILE IN NEW LONDON, CONNECTICUT | Case No.<br><br>November 9, 2021 |

**CONSLIDATED AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANTS**

I, Delmar A. Carter Jr. being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (1) the premises known as ▮▮▮▮▮▮ ▮▮▮▮ New London, Connecticut 06320 (hereinafter "PREMISES"), further described in Attachment A-1, and (2) the vehicle described in Attachment A-2; and to search both locations for the things described in Attachment B.  Based on a Complaint and arrest warrant issued November 2, 2021, in case number 21-MJ-643, in the United States District Court for the District of Columbia, agents also plan to arrest BAOUCHE if he is located at the premises, for charges arising out of his involvement in the January 6, 2021, events as detailed below.

2.  I am a Task Force Officer, (TFO) with the Federal Bureau of Investigation (FBI), and have been assigned to the New Haven Field Office on the Joint Terrorism Task Force (JTTF) since approximately November 2011. I am a Detective with the Norwich Connecticut Police Department and have been so employed since May 1999. My previous assignment in Norwich was a Detective assigned to the narcotics division which included the

1

investigation of all other major crimes as well. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.  Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. 1752(a)(1) & (2), and 40 U.S.C. §§ 5104(e)(2)(D) & (G) have been committed by JEREMY K. BAOUCHE and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the PREMISES and vehicle, further described in Attachments A-1 and A-2, for the things described in Attachment B.

**PROBABLE CAUSE**

*Background – The U.S. Capitol on January 6, 2021*

5.  The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6. At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

7. The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8. On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

9. A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

10. The joint session began at approximately 1:00 p.m. in the House Chamber.

11. At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

12. As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

13. At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

14. At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the

crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



15. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

16. At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

17. Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

18. At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

19. At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



20. After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



21. A subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."



22. During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





23. At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

24. At about 3:25 p.m., law enforcement officers cleared the Senate floor.

25. Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

26. Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

27. Beginning around 8:00 p.m., the Senate resumed work on the Certification.

28. Beginning around 9:00 p.m., the House resumed work on the Certification.

29. Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

30. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

31. Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

32. Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

33. Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:







*Facts Specific to This Application*

34. On January 13, 2021, Tipster 1 submitted an online tip, Tip #1, to the FBI National Threat Operations Center (NTOC) via tips.fbi.gov, to report JEREMY BAOUCHE, date of birth xx/xx/19xx, cellular telephone number ending in -3633, an electrical engineer at Electric Boat in Groton, Connecticut, as the potential identity of the subject in FBI US Capitol photograph #19, wearing the red and black plaid shirt, black bookbag, jeans, red cap, and face covering.

35. On January 13, 2021, Tipster 2 submitted a tip, Tip #2, via OPA (Office of Public Affairs) tips with a copy of the widely circulated FBI photograph 19 and the statement, "One of the people who took part in the attempted coup is named JEREMY BAOUCHE. He is a University of Connecticut alumni and was seen in various photos inside of the capitol building, which have been attached below. He is currently employed at General Dynamics Electric Boat as an engineer according to LinkedIn."

36. On January 15, 2021, Tipster 3 submitted a tip, Tip #3, via OPA tips with a copy of the widely circulated FBI photograph 19 and the statement, "Red plaid shirt, red had: JEREMY BAOUCHE of Connecticut."

37. It was later learned, however, that the individual in photograph #19 was in fact not JEREMY BAOUCHE. The subject in FBI photograph #19 was identified as, Elliot Bishai, who was arrested on March 16, 2021, by the Columbia Field Office for, 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 40 U.S.C § 5104(e)(2) in case number 1:21CR282. FBI photograph #19 is displayed below:



38. On January 20, 2021, Task Force Officers Delmar Carter and Erich Banwell, (FBI-JTTF) attempted to interview JEREMY BAOUCHE at Electric Boat in Groton, Connecticut. Prior to the interview, it was learned that BAOUCHE had taken both January 5 and January 6, 2021, off from work.

39. Early in the interview, TFO Carter asked BAOUCHE if he knew why we wanted to speak with him. BAOUCHE stated he was unaware of any reason. TFO Carter advised BAOUCHE that we wanted to speak with him about the U.S. Capitol. BAOUCHE was told the reason for the interview and said he would not answer any questions without an attorney. The interview then ended.

40. On January 22, 2021, BAOUCHE's employer, Electric Boat (a Department of Defense Contractor), voluntarily provided TFO Carter with an internet search history from BAOUCHE's work computer from December 1, 2020, until January 20, 2021. They also provided the security banner that all employees see when they use a computer at Electric

Boat that states it is subject to search by the employer. In BAOUCHE's search history there were searches on topics including the inauguration, the U.S. Capitol building layout, guns, rifle scopes, lasers, Trump protests, FBI Capitol, and searches for jobs in the western U.S. It should be noted that BAOUCHE has a secret security clearance as part of his employment.

41. On February 3, 2021, TFO Carter and TFO Banwell interviewed W-1, a person that knows BAOUCHE and knows what he looks like. W-1 was aware that BAOUCHE had gone to the Capitol to see the President, but said they had no knowledge of BAOUCHE going into the Capitol. W-1 said that photograph #19 was not BAOUCHE and claimed they had asked people to stop saying it was him, because they knew it was not him. W-1's parents were also present during the interview. They both were aware that BAOUCHE had gone to the Capitol but had no knowledge of him entering the Capitol.

42. According to records obtained through a search warrant which was served on Google, a mobile device associated with UserName ████████@gmail.com (device # XXX-XXX-3633) was present at the U.S. Capitol on January 6, 2021. Google estimates device location using sources including GPS data and information about nearby Wi-Fi access points and Bluetooth beacons. This location data varies in its accuracy, depending on the source(s) of the data. As a result, Google assigns a "maps display radius" for each location data point. Thus, where Google estimates that its location data is accurate to within 10 meters, Google assigns a "maps display radius" of 10 meters to the location data point. Finally, Google reports that its' "maps display radius" reflects the actual location of the covered device approximately 68% of the time. In this case, Google location data shows that a device associated with ████████@gmail.com was within the U.S. Capitol at the times and

locations shown in the maps below. During the time period of 2:38 P.M. and 2:50 P.M. on

January 6, 2021 it appears that the phone is within the US Capitol.





43. Law enforcement began reviewing video from inside of the Capitol, based on the information above. During the course of this review, TFO Banwell immediately recognized, BAOUCHE in the video and noted that he was wearing a leather jacket that he was wearing in a social media post standing with Roger Stone, from January 5, 2021. In the reviewed video clip, BAOUCHE is seen in the Capitol rotunda and is carrying a megaphone and a cell phone. A still photograph from the clip appears below.



44. TFO Banwell and TFO Hine, (FBI-JTTF) were able to locate additional video clips of BAOUCHE inside the U.S. Capitol on January 6, 2021. The times on some of the U.S. Capitol cameras record time in UTC and some record in EST, all times have been converted to EST. BAOUCHE was seen entering the US Capitol through the Upper West Terrace Door at approximately 14:35 EST. BAOUCHE is seen entering the Upper West Terrace and going up the stairs at approximately 14:35 EST. BAOUCHE enters the Rotunda at approximately 14:36 EST. BAOUCHE is seen exiting the rotunda through the north exit at 14:37 EST and reappears at the north exit at approximately 14:38 EST. BAOUCHE is picked up by USCS Cameras 0959 and 0218 at approximately 14:35 EST until 14:38 EST

in the rotunda. BAOUCHE is seen exiting the Rotunda towards the north exit and reappearing between 14:40 EST and 14:52 EST. BAOUCHE exits to the east at approximately 14:51 EST. BAOUCHE leaves the Capitol building at approximately 14:52 EST. BAOUCHE is seen carrying a megaphone throughout the video clips and appears to have at least two unidentified subjects with him. Images from this footage include the images below:





45. On April 30, 2021, TFO Banwell and TFO Carter met with Witness 2 (W-2), who works with BAOUCHE at Electric Boat. W-2 was shown still photographs that were clipped from the videos of BAOUCHE, in an attempt to identify BAOUCHE. W-2 was told that law enforcement was trying to identify a subject in a photograph and he was not told any other details about the subject. W-2 looked at the first photograph and immediately said he knew the subject. TFO Banwell asked how he knew the subject and W-2 said that it was an employee with whom he has regular contact, JEREMY BAOUCHE. W-2 was asked how he knew it was him, and he said the face and the distinct hair style. W-2 was shown other still shots and he again identified BAOUCHE and said BAOUCHE was wearing a large watch in one of the pictures, that he always wears. W-2 did express concern when he saw a photo of BAOUCHE with a megaphone. TFO Banwell asked what was concerning and W-2 said it was clear that BAOUCHE was at the U.S. Capitol. W-2 then said he recalled BAOUCHE taking off January 5, 2021 and January 6, 2021. W-2 said that BAOUCHE told him he was going fishing with his grandfather. W-2 said he thought this was strange to go fishing with a grandfather in January, but then thought maybe it was ice fishing. W-2 was asked if BAOUCHE wore his pants in a distinct way. W-2 said that BAOUCHE cuffed his pants, which was unusual. In one of the video clips, BAOUCHE is seen with his pant legs cuffed. TFO Carter also noted that when BAOUCHE was attempted to be interviewed, his pant legs were cuffed.

46. In open source video, BAOUCHE is seen in the Capitol, calling into the megaphone "who's house" while people in the area responded "our house" at least three times. See photographs below.





47. Agents have probable cause to believe BAOUCHE resides at the PREMISES ███████ ████████ New London, Connecticut 06320. BAOUCHE is the renter of the PREMISES and M█████ F██ is the owner according to New London GIS property records. Furthermore, TFO'S Erich Banwell and Delmar Carter through surveillance/spot/checks have observed the blue Volkswagen Jetta bearing Connecticut registration ███████, VIN #███████████ 9084, parked in front of the PREMISES. TFO'S Banwell and Carter also observed BAOUCHE leave work in Groton, Connecticut and drive directly to ███ ███████ New London, Connecticut, in his blue Volkswagen. According to NCIC as of 11-1-2021 this vehicle is registered to Jeremy BAOUCHE which lists an old address. Furthermore during surveillance the affiant has observed Jeremy BAOUCHE operate this vehicle solely to and from work. As recent as 11-1-2021 Jeremy BAOUCHE was observed during surveillance leaving his residence of ██████████ New London, Connecticut and getting into the aforementioned vehicle.

48. I know, based on my training and experience, that people routinely re-wear clothing and accessories and store these items in their homes. Clothing and accessories consistent with those worn by BAOUCHE on January 6, 2021, constitute evidence of the commission of the offenses discussed herein, in that BAOUCHE can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire and accessories worn that day. Items such as megaphones are expensive, and I know, based on my training and experience, that people generally do not discard such items and they keep these items for long periods of time in safe places for use in the future. Further, the megaphone that BAOUCHE was using, as observed in videos and photos, is not an everyday item that one would carry from their residence to a vehicle for example. Rather,

it is an item that would be expected to be stored in a vehicle or trunk of a vehicle due to its size and weight, to have ready access to be used at certain events.  I also know, based on my training and experience, that cell phones are expensive, and people routinely retain their cell phones for many months or years. Individuals also store items such as clothing, cell phones and megaphones in their vehicles or in other structures on their property or in the curtilage of a property such as a residence. It is possible BAOUCHE has stored his bomber jacket, blue jeans, glasses, megaphone, cell phone or other items connected to the Subject Offenses in his vehicle or another structure on the PREMISES. There is thus probable cause to search vehicles and other structures or appurtenances of the curtilage for the items described in Attachment B.

49. As described above, there is evidence that BAOUCHE had in his possession a cellular telephone (digital device) while at the U.S. Capitol on January 6, 2021. BAOUCHE took videos of himself at the U.S. Capitol and these videos were recovered in a search warrant executed on BAOUCHE'S Google account. In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses. Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

50. Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations have been

known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications. The property to be searched includes cellular telephone with phone number XXX-XXX-3633, hereinafter the "Device."

51. BAOUCHE took videos of himself at the U.S. Capitol with the Device and stored these videos to his Google account. Videos I reviewed from the January 6, 2021, breach at the U.S. Capitol show BAOUCHE carrying a cell phone through the interior of the U.S. Capitol building. The Device is owned by BAOUCHE based upon subscriber information legally obtained from the service provider. Additionally, according to records obtained through a search warrant which was served on the service provider, on January 6, 2021, in and around the time of the incident, the Device associated with XXX-XXX-3633 was identified as having utilized a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol building. Based upon my training and experience, I believe the Device will contain incriminating evidence, fruits, instrumentalities or contraband related to the suspected offense and that the information described in Attachment B remains stored on the Device. Investigators have reason to believe that the Device is currently located at the PREMISES because the Device is owned by BAOUCHE who rents the PREMISES, and cellular telephones are typically stored on the person who owns the Device, at the residence of the owner or in a vehicle used by the owner.

## METHODS TO BE USED TO SEARCH  THE DEVICE

52. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

    a.   Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of the device that is being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

    b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for

computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.   Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be

bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.   Based on all of the foregoing, I respectfully submit that searching the Device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the Device In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

53. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

    i. Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize the digital device within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport this item to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of the Device at the PREMISES. The Device, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

    ii. The analysis of the contents of the Device may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and

possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

    iii.   In searching the Device, the forensic examiners may examine as much of the contents of the  Device as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital Device will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

54. This warrant permits law enforcement agents to obtain from the person of JEREMY K. BAOUCHE the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock  the Device requiring such biometic access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device. The grounds for this request are as follows:

55. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

56. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

57. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

58. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

59.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

60. As discussed in this Affidavit, your Affiant has reason to believe that the Device, will be found during the search. The passcode or password that would unlock the Device subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

61. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

62. Due to the foregoing, if law enforcement personnel encounter the Device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Device, including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device found at the PREMISES; (2) hold the Device found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of

attempting to unlock the Device in order to search the contents as authorized by this warrant.

63. The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to the Device, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the Device, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

64. I submit that this affidavit supports probable cause for a warrant to search the PREMISES
described in Attachment A-1 and the vehicle described in Attachment A-2 and to seize the
items described in Attachment B.

Respectfully submitted,

Delmar A. Carter Jr.
Task Force Officer, (TFO)
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on November 9, 2021

Robert M. Spector    Digitally signed by Robert
M. Spector
Date: 2021.11.09
15:21:25 -05'00'

ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

*Property to be searched*

The person of JEREMY K. BAOUCHE, provided that BAOUCHE is located within the District of Connecticut at the time of the search.  BAOUCHE is described as a white male, date of birth ████ 1997.

The property to be searched is legally described as:  a two-family residence with a physical address ████████████ New London, New London County, Connecticut 06320 (the "PREMISES"). The PREMISES is owned by M███ F███ according to a query of the New London, Connecticut GIS property records. The PREMISES is further described as an .11 acre homesite with two stories, four bedrooms and two baths, tan vinyl siding and a front stoop. The residence is accessed through a single front door in front of the residence facing ██████████. The first floor is 1,223 square feet, the second floor is 1,223 square feet and the unfinished basement is 1,223 square feet. On August 26, 2021 the United Postal Service, (USPS) also confirmed that, Jeremy K, Baouche and R███ K███, (Girlfriend) receive mail at ████████ ████████ New London, Connecticut. Warrant authorizes the search of all structures at the PREMISES, for the purpose of identifying information in Attachment B.

Images of the New London Connecticut property map and photographs of dwelling and buildings are pictured below.

Additionally, because a cellular telephone can be found or hidden on individual persons, this warrant also authorizes the search of JERMEY K. BAOUCHE.

1











| Building Sub-Areas (sq ft) | | | Legend |
|---|---|---|---|
| Code | Description | Gross Area | Living Area |
| BAS | First Floor | 1,223 | 1,223 |
| FUS | Upper Story, Finished | 1,223 | 1,223 |
| FOP | Porch, Open, Finished | 24 | 0 |
| UBM | Basement, Unfinished | 1,223 | 0 |
| WDK | Deck, Wood | 64 | 0 |
| | | 3,757 | 2,446 |

## **ATTACHMENT A-2**

*Property to be search*

A blue Volkswagen Jetta, Vehicle Identification Number (VIN) ██████████████ 9084, registered to JEREMY K. BAOUCHE.

## ATTACHMENT B

*Property to be seized*

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C § 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by JEREMY K. BAOUCHE ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

    a. Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

    b. Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

    c. Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    d. Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    e. Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

    f. Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

1

g.  Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.  Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties at the United States Capitol on January 6, 2021;

i.  Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.  Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.  Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.  Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.  Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.  Evidence of the state of mind of the subject and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

2

    o.       Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2. Records and information that constitute evidence of identity, including but not limited to:

    a.       clothing worn by the subject, to include a tan bomber jacker, blue jeans with cuffed pant legs, yellow t-shirt, tan boots, tinted glasses with black frames;

    b.       clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

    c.       Other paraphernalia used by or associated with the Subject to include, red and white Pyle mega phone;

3. Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

    a.       Any records and/or evidence revealing the Subject's presence at the January 6, 2021, riot;

    b.       Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

    c.       The Subject's (and other's) motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

d.      The Subject's (and others's) activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

4.  For the   cellular telephone, XXX-XXX-3633, which   is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)," for the time period from November 3, 2020, through January 7, 2021:

a.      evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.      evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

e.      evidence of the times the Device was used;

f.      passwords, encryption keys, and other access devices that may be necessary to access the Device;

g.       documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

h.       records of or information about Internet Protocol addresses used by the Device;

i.       records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

j.       Evidence of photos, videos, and other media documenting the planning, implementation, and participation in his activities in and around the Subject's activities on January 6, 2021.

k.       Evidence of contacts with whom the Subject associated with in and around his activities on January 6, 2021.

5.  During the execution of the search of the PREMISES described in Attachment A-1, law enforcement personnel are also specifically authorized to obtain from JEREMY K. BAOUCHE the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock  the Device requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

a.       the Device found at the PREMISES,

5

  b.  where the Device is limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device's security features in order to search the contents as authorized by this warrant.

  While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device.  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) is permitted.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.